UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Wells Fargo Bank, N.A., AS
TRUSTEE FOR THE REGISTERED
HOLDERS OF CREDIT SUISSE FIRST
BOSTON MORTGAGE SECURITIES
CORP., COMMERCIAL MORTGAGE
PASS-THROUGH CERTIFICATES,
SERIES 2007-C5,

       Plaintiff,

   v.

CCC Atlantic, LLC,

       Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 12-521
(JEI/JS)

**OPINION**

**APPEARANCES:**

DINSMORE & SHOHL LLP
By:  Richard A. O'Halloran, Esq.
    Alyson H. Ricker, Esq.
502 Carnegie Center
Suite 103
Princeton, New Jersey 08540
    Counsel for Wells Fargo Bank, N.A. as Trustee

SILVERANG & DONOHOE, LLC
By:  Mark S. Haltzman, Esq.
    Philip S. Rosenzweig, Esq.
595 East Lancaster Avenue
Suite 203
Saint Davids, Pennsylvania 19087
    Counsel for CCC Atlantic, LLC

**IRENAS,** Senior District Judge:

    This suit is a commercial foreclosure action.  Before the
Court are Plaintiff's Motion to Appoint a Receiver (Dkt. No. 8),
and Defendant's Motion to Dismiss for Lack of Subject Matter
Jurisdiction (Dkt. No. 14).  For the reasons stated below, the
Court concludes that complete diversity of citizenship exists, and

that Plaintiff is entitled to the appointment of a receiver. Accordingly, Defendant's Motion will be denied and Plaintiff's Motion will be granted.

## I.

### A. Facts relevant to the jurisdictional analysis

The mortgage sought to be foreclosed upon in this action is an asset held by Plaintiff Wells Fargo Bank, N.A. as Trustee for Holders of Credit Suisse First Boston Mortgage Securities Corp. Commercial Mortgage Pass-Through Certificates, Series 2007-C5. The "Pooling and Servicing Agreement, Dated as of November 1, 2007" (Wells Fargo brief, Ex. 2) (the "PSA")-- a 311-page document (excluding the 51 exhibits thereto)-- is the focus of the parties' and the Court's attention.

In transactions "dated as of November 1, 2007," Column Financial, Inc.; KeyBank National Association; and Capmark Finance Inc., sold "certain mortgage loans" to Credit Suisse First Boston Mortgage Securities Corp. for the purpose of creating a pool of assets (i.e., mortgages) in which investors could invest by purchasing mortgage pass-through certificates (also known as "private label mortgage-backed securities"[1]). (PSA, p. 1) As of November, 2007, the mortgage loans had an aggregate principal balance of over $2.7 billion. (PSA, p. 6)

---

[1] *See generally http://www.sec.gov/answers/ mortgagesecurities.htm*

PSA Section 2.01, entitled "Conveyance of Original Trust Mortgage Loans," provides, in relevant part,

> (a) It is the intention of the parties hereto that a common law trust be established under the laws of the State of New York. . . . Wells Fargo is hereby appointed, and does hereby agree to act, as Trustee hereunder and, in such capacity, to hold the Trust Fund in trust for the exclusive use and benefit of all present and future Certificateholders. . . .
> The Depositor [Credit Suisse First Boston Mortgage Securities Corp.], concurrently with the execution and delivery hereof, does hereby assign, sell, transfer, set over and otherwise convey to the Trustee, without recourse, for the benefit of the Certificateholders all the right, title and interest of the Depositor, . . . in, to and under (i) the Original Trust Mortgage Loans . . . . The transfer of the Original Trust Mortgage Loans and the related rights and property accomplished hereby is absolute . . . and is intended by the parties to constitute a sale.

(PSA, p. 107)

In addition to creating a trust in which the mortgages are held, the PSA establishes the procedures for "administration and servicing of the trust fund." (See generally PSA, Article III, pp. 122-219)  Relevant to the instant case, the PSA provides that the Master Servicer(s) and Special Servicer "shall service and administer the Mortgage Loans . . . *on behalf of the Trustee and in the best interests of an for the benefit of the Certificate-holders.*"  (PSA, § 3.01(a), p. 122)(emphasis added).

The Master Servicer[2] collects, among other things, payments on

---

[2]  The original Master Servicers, according to the PSA, were Keycorp Real Estate Capital Markets, Inc. and Capmark Finance, Inc.  (As already noted, Capmark Finance and KeyBank National

account of principal and interest on the Trust Mortgage Loans and
deposits them into the Collection Account.  (PSA, § 3.04(a), p.
133)[3]  Thereafter, the PSA provides that the "Master Servicer *shall*
deliver to the Trustee each month" a certain amount of money "then
on deposit in the Collection Account" for the Trustee to deposit
into the Distribution Account, which account holds the funds to be
distributed by the Trustee to the Certificateholders, in order of
priority.  (§ 3.04(b), p. 134; § 3.05(b), p. 148) (emphasis
added).[4]  Thus, the Master Servicer collects mortgage loan payments
(on the Trustee's behalf) which the Trustee ultimately distributes
to the trust beneficiaries (the Certificateholders).

    Similarly, when a mortgage is in default, the PSA directs that
the Special Servicer[5] "shall exercise reasonable efforts to

---

Association were two of the three banks who sold their loans to
Credit Suisse to be included in the mortgage pool.)
    The PSA allows for, under certain circumstances, changes in
Master Servicers upon "merger, consolidation, or conversion," or
"resignation," of an existing Master Servicer. (PSA §§ 6.02,
6.04)  The PSA also allows for "sub-servicing agreements" between
a Master Servicer and "third parties" to provide for the
performance of "any or all of [the Master Servicers] respective
obligations under" the PSA. (PSA § 3.22)

    [3]  Importantly, the PSA defines the "Collection Account" as
"[o]ne or more separate *custodial* accounts . . . created and
maintained by the applicable Master Servicer . . . *in the name of
the Trustee on behalf of the Certificateholders*."  (PSA, § 1.01,
p. 34) (emphasis added)

    [4]  Only the Trustee can invest the funds held in the
Distribution Account.  (See PSA, § 3.06(a)(iii), p. 149)

    [5]  The PSA identifies Centerline Servicing, Inc. as the
original Special Servicer.  The PSA's provisions concerning
changes to the Master Servicers apply to the Special Servicer as

foreclose upon the ownership of any property securing such Mortgage Loans." (§ 3.09(a), p. 163)  Any money collected by the Special Servicer in a foreclosure action must be remitted "to the applicable Master Servicer for deposit into the Collection Account," (PSA, § 3.04(a)(viii), p. 134), which, as described above, is later deposited into the Trustee's Distribution Account.

Finally, if either the Master Servicer or Special Servicer resigns or is terminated, the Trustee must take on "all the responsibilities [and] duties" of the servicer, unless, or until, a new servicer is appointed.  (PSA, § 7.02, p. 264; § 8.01(a), p. 267)

## B.  Facts giving rise to the parties' dispute

The property at issue in this suit-- the Cornerstone Commerce Center in Linwood, New Jersey (owned at all relevant times by Defendant CCC Atlantic, LLC)-- originally secured a commercial mortgage loan in the amount of $41 million.  Approximately seven months after the original mortgage transaction took place, the Original Note was bifurcated into an A Note, with a principal amount of $36.9 million; and a B Note, with a principal amount of $4.1 million.  Both the A Note and B Note were originally payable to Capmark Bank.

---

well.  (See PSA §§ 6.02, 6.04)  Likewise, the Special Servicer is allowed to hire sub-servicers. (PSA § 3.22)
    It appears that the Special Servicer for the loan at issue in this case is Berkadia.  (Pl's Reply Brief, Ex. 1)

As described above, Plaintiff Wells Fargo came to be the current holder of the A Note when, in 2007, Capmark sold the A Note to Credit Suisse First Boston Mortgage Securities Corp., who in turn, sold it to Wells Fargo as Trustee for the Holders of the Commercial Mortgage Pass-Through Certificates, Series 2007-C5.[6]

In September, 2011, CCC Atlantic's tax escrow account balance undisputedly was not sufficient to pay the entirety of its municipal property taxes.  But CCC Atlantic contends that the escrow shortfall was simply the result of an "anomalous" situation resulting from the expiration of the tax abatement on the property at issue.

The Cornerstone Commerce Center was "developed . . . in a specially designated redevelopment zone in Linwood" thereby allowing CCC Atlantic to take advantage of Linwood's "graduated tax abatement program whereby the increased [tax] assessment for the Property occasioned by the redevelopment and construction of the [Commerce Center] would not be fully taxed for a period of five years."  Karman Aff. ¶ 6.  Thus, in year one of the abatement period, CCC Atlantic paid no taxes on the higher assessed value of the redeveloped property (approximately $17 million in improvements) but rather only paid taxes on the original assessment of $4.8 million.  In year two of the abatement period, CCC Atlantic

---

[6]   Several other documents were executed in connection with the sale of the A Note and are attached as exhibits to the Complaint and to Wells Fargo's Motion. The parties refer to these documents collectively as the "Loan Documents."

paid 20% of the additional assessment; in year three, 40%; in year four, 60%; and in year five, 80%.  Id. ¶ 7.

The parties do not dispute that Linwood billed Wells Fargo for the taxes due on the original assessment, but as to the additional payments due in years two through five of the abatement program, Linwood billed CCC Atlantic directly.  Apparently CCC Atlantic expected this practice to continue after the abatement program expired, and therefore its escrow account with Wells Fargo never had enough money to pay the entire tax bill.  This practice, however, did not continue.  After the abatement program's expiration, Linwood sent one tax bill to Wells Fargo for all of the property taxes due for August, 2011.

Upon receiving the bill, Wells Fargo used all of the funds then available in the escrow account ($57,144.39) and advanced the difference of $272,385.67 on August 3, 2011.  Wells Fargo sent CCC Atlantic a cure notice giving it ten days in which to reimburse Wells Fargo for the advance.  Karman Aff. ¶ 13.

CCC Atlantic could not cure the default.  Indeed, in response to the cure notice, CCC Atlantic sent Wells Fargo a "proposal" for remedying the escrow deficiency by the end of 2013 (i.e., more than a year after the initial default).  (Karman Aff. Ex. A.)  In that proposal CCC Atlantic admitted, "the need to make rent and other leasing concessions to attract and keep quality tenants has had a significant impact on [CCC Atlantic's] current cash position.  CCC Atlantic LLC does not have the cash flow to make up this deficiency

7

in a lump sum payment." (Id.)

On September 12, 2011, Wells Fargo formally declared the Loan to be in default and demanded that CCC Atlantic pay it $406,510.96, which sum included various fees, default interest, interest, the tax advance, and the "tax shortfall", among other charges. (Wells Fargo Ex. 1)  The demand also reflected as a credit the $249,221.79 that CCC Atlantic paid to Wells Fargo after the original default, which CCC Atlantic intended as interest payments on the loan. (Id.)

On October 28, 2011, the tax escrow account experienced another shortfall when the unabated tax bill for November, 2011 came due.  According to Wells Fargo, "taxes due totaled $329,141.71, but only $59,191.73 was available;" thus Wells Fargo "advanced $269,949.98 to cover the shortfall."  (Wells Fargo's Reply Brief; see also Karman Aff. ¶ 15)  This shortfall was not surprising to either party; in CCC Atlantic's previous proposal to cure its initial default, it had anticipated such a shortfall. (See Karman Aff. Ex. A)

Accordingly, after two consecutive defaults on the unabated tax payments, on November 15, 2011, Wells Fargo, through counsel, sent CCC Atlantic an Acceleration Notice advising that unless CCC Atlantic cured its default, the entire Loan would be accelerated in 10 days.  (Wells Fargo Ex. 2)  CCC Atlantic, of course, did not cure the default and the Loan was accelerated on November 25, 2011.

8

This foreclosure action was filed on January 27, 2012.  The Court held oral argument on the instant Motions on November 14, 2012,[7] and supplemental briefing concerning issues raised at oral argument was completed on November 16, 2012.

## II.

## A.

Federal Rule of Civil Procedure 12(b)(1) provides in relevant part, "[a] party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction."

There are two types of challenges to a district court's subject matter jurisdiction: facial attacks and factual attacks. *Common Cause v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009). "Facial attacks . . . contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true." *Id.*

Factual challenges are different.  Such challenges have "three important procedural consequences."  *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008).  First, the complaint's allegations are not presumed to be true.  *Id.*  Second, the burden of proving, by a preponderance of the evidence, the existence of subject matter jurisdiction, rests with the plaintiff.  *Id.*  Third, this Court may

_____

[7]   In the interim between when the Motions were filed and oral argument, the parties attempted to settle their dispute but were ultimately unable to do so.

"make factual findings which are decisive to the issue."  *Id.*
(internal citation and quotation omitted).

The instant motion raises a factual challenge.


**B.**

Federal Rule of Civil Procedure 66 provides that "[t]hese
rules govern an action in which the appointment of a receiver is
sought."

In diversity suits, federal law governs the issue of whether a
receiver should be appointed.  *Maxwell v. Enterprise Wall Paper
Mfg. Co.*, 131 F.2d 400, 402 (3d Cir. 1942) ("What form of equitable
relief a plaintiff is to be given by a federal court for
infringement of his rights, we have held to be a matter to be
determined by federal law, not state decisions.").[8]

---

[8]  *See also Canada Life Assur. Co. v. LaPeter,* 563 F.3d 837
(9th Cir. 2009); *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev.
Corp.,* 153 F.3d 1289 (11th Cir. 1998); *Aviation Supply Corp. v.
R.S.B.I. Aerospace, Inc.*, 999 F.2d 314 (8th Cir. 1993); 12
Wright, Miller, Kane & Marcus, Federal Practice and Procedure,
§ 2983 ("Whether a federal court should appoint a receiver in a
diversity action appears to be a question properly determined on
the basis of federal law."); 13-66 Moore's Federal Practice -
Civil § 66.09 ("Federal law and federal practice govern the
appointment of a federal equity receiver. . . . [T]o use federal
law is not inconsistent with the *Erie* doctrine . . . because the
appointment of a receiver does not directly affect the outcome of
the case.  By definition, the appointment of a receiver is
ancillary to the primary relief being sought, so the appointment
of a receiver does not directly affect the outcome of a
particular action."); *but see Mintzer v. Arthur L. Wright & Co.,
Inc.*, 263 F.2d 823, 825 (3d Cir. 1959) (concluding that the right
to the appointment of a receiver is a substantive right under
*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) and *Guaranty Trust*

## III.

The Court must consider the jurisdictional question before proceeding to the merits of appointing a receiver.

### A.

### (1)

The issue is whether, for diversity purposes, the Court looks to the state of citizenship of the named Plaintiff, Wells Fargo Bank, N.A. (South Dakota[9]), or the states of citizenship of the many trust beneficiaries (the Certificateholders).[10]  If it is the

---

*Co. of N.Y. v. York*, 326 U.S. 99 (1945) and therefore concluding that federal courts sitting in diversity should apply state law); *New Eng. Mut. Life Ins. Co. v. Troy Ventures, Ltd.*, No. 94-3299, 1994 U.S. Dist. LEXIS 18155 at *24-25 (D.N.J. Dec. 14, 1994) (concluding that state law should apply, observing, "[c]ommentators have argued that, because Federal Rule of Civil Procedure 66 purports to govern the appointment of receivers, *Mintzer* is suspect in light of the opinion of the Supreme Court in *Hanna v. Plumer*, 380 U.S. 460 (1965). . . . On the other hand, an analogy is possible between the appointment of a receiver to collect rents, and the assignment of rents, which is generally held to be controlled by state law.") (internal citations omitted).  The Court notes that neither *Mintzer* nor *Troy Ventures* cited *Maxwell*.

[9]  Wells Fargo is a national banking association. (Pl's Ex. 1) For diversity purposes it is deemed a citizen of the State in which it is "located," 28 U.S.C. § 1348, which is determined by reference to the bank's main office as designated in their articles of association.  *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006).  Wells Fargo's main office is in Sioux Falls, South Dakota.  (Pl's Ex. 1)

[10]  The present record does not include the states of citizenship for the individual Certificateholders.

former, there is complete diversity between the parties because the members of Defendant CCC Atlantic, LLC, are citizens of Delaware, New Jersey, Pennsylvania, and North Carolina.[11]  If it is the latter, CCC Atlantic asserts that Wells Fargo has not sustained its burden of demonstrating that complete diversity exists.

In *Navarro Savings Association v. Lee, Jr.*, the Supreme Court held that the citizenship of an "active trustee" of an "express trust"[12] is determined by the trustee's state of citizenship, not the beneficial owners' states of citizenship.  446 U.S. 458, 462, 465 (1980).  *See also Emerald Investors Trust v. Gaunt Parsippany Partners, et. al,* 492 F.3d 192, 200-01 (3d Cir. 2007) ("In a suit by . . . the individual trustees of a trust, where the trustees 'possess certain customary powers to hold, manage, and dispose of assets,' their citizenship, and not that of trust beneficiaries, is controlling for diversity of citizenship purposes.") (quoting *Navarro*, 446 U.S. at 464-66).

CCC Atlantic argues that *Navarro's* holding does not apply in

_____

[11]  "[T]he citizenship of an LLC is determined by the citizenship of each of its members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).

[12]  The *Navarro* opinion does not define "express trust."  The Court presumes that term has the same meaning as stated in the Restatement (Second) of Trusts: "[t]he term 'express trust' is used to . . . emphasize the contrast between a trust as here defined on the one hand and a resulting trust or a constructive trust on the other hand." § 2, comment a.; *see also* Restatement (Third) of Trusts, § 2, comment a. (using "express trust" to distinguish such trusts from constructive trusts and resulting trusts).

this case because Wells Fargo is merely a "naked trustee," *Navarro*, 446 U.S. at 465, which "does not have real and active control over the assets of the trust."  (Moving brief, p. 12)  Wells Fargo flatly denies this contention, asserting that it does in fact "maintain[] control over the [trust] assets" and "is in sole control of holding and distributing the [trust] assets." (Opposition brief, p. 5)

In support of its position, Wells Fargo submits the "Pooling Service Agreement" ("PSA").  The Court agrees that the PSA adequately demonstrates that Wells Fargo is an active trustee.[13]

Pursuant to the provisions of the PSA, quoted at length *supra* at pages 2 through 4, Wells Fargo as Trustee has actual control over the trust assets: it holds legal title to the mortgage loans; the funds in both the Collection Account and the Distribution

---

[13]  CCC Atlantic argues for the first time in its reply brief that "the 'trust' here is not a trust at all in the conventional legal sense.  Rather, this arrangement is no more and no less than a typical loan . . . 'pooling agreement.'" (Reply Brief, p. 8) CCC Atlantic relies on the absence of "any trust indenture or other grant of trust," (id.) to support its assertion that no trust exists.  The PSA directly undermines this argument.  PSA § 2.01(a), quoted *supra* at p. 3, expressly creates a trust.  *See generally* 1 Austin Wakeman Scott, William Franklin Fratcher, & Mark L. Ascher, *Scott and Ascher on Trusts*, § 3.1 (5th ed. 2006) ("Usually, a trust comes into existence upon the transfer of property . . . to another, as trustee. . . . In the case of an *inter vivos* transfer in trust [as opposed to a trust created by will], the transferor is the creator and the terms of the trust ordinarily appear in the instrument of transfer. . . . Alternatively, they may appear in an instrument executed by the Trustee, acknowledging receipt of the property and that he or she holds it in trust.").

Account belong to it[14]; only it has the power to invest the money in the Distribution Account.

Moreover, contrary to CCC Atlantic's argument, the fact that the Trustee has delegated loan servicing duties to the Master Servicer and the Special Servicer does not compel the conclusion that the Trustee lacks the requisite control.  As already explained, the money the servicers collect belongs to Wells Fargo (for the benefit of the Certificateholders), not the servicers themselves.  Additionally, the ultimate duty to collect on the mortgage loans-- whether in the regular course of business, or through foreclosure-- remains with Wells Fargo because it must fulfill the duty in the absence of the Master Servicer or the Special Servicer.[15]

The Court is also unpersuaded by CCC Atlantic's argument that Wells Fargo lacks the requisite control because, under limited circumstances, particular Certificateholders may make decisions

---

[14]   Indeed, both the failure of any servicer to deposit funds into the Collection Account, and the failure of the Master Servicer to deliver Collection Account funds to Wells Fargo are "Events of Default" under the PSA justifying termination of the servicer.  (PSA § 7.01(a)(i)-(ii), p. 258)

[15]   *See generally* Restatement (Third) of Trusts § 80, comment e. ("Although the administration of a trust may not be delegated in full . . . a trustee may for many purposes delegate fiduciary authority to properly selected, instructed, and supervised or monitored agents. . . . A delegation of fiduciary authority is proper when it is prudently arranged and is reasonably intended to further sound administration of the trust. Certainly it is proper to delegate the performance of acts that it would be unreasonable to expect the trustee personally to perform.").

concerning the trust.  For example, CCC Atlantic relies on PSA

Section 9.01, which gives certain Certificateholders the right to

terminate the trust by purchasing all of the assets of the trust.

However, such was the situation in *Navarro* where the Trustee was

held to be an active trustee.  In that case, the Court observed

that the trust beneficiaries could "elect and remove trustees; . .

. terminate the trust or amend the Declaration [of trust]; and they

must approve any disposition of more than half the trust estate."

*Navarro*, 446 U.S. at 465 n.14.  Thus, the fact that

Certificateholders have some control over the trust does not compel

the conclusion that Wells Fargo is not an active trustee.[16]

The Court concludes that Wells Fargo has carried its burden of

proving by a preponderance of the evidence that it is an active

trustee.  Therefore the Court looks to Wells Fargo's state of

citizenship (South Dakota)-- not the states of citizenship of the

trust beneficiaries[17]--for diversity jurisdiction purposes.[18]

---

[16]   CCC Atlantic also heavily relies on the special
provisions concerning the Cornerstone Commerce Center Loan (the
loan at issue here), arguing that Wells Fargo has even less
control with regard to it.  Even if the Court assumes *arguendo*
that CCC Atlantic is correct, this would not change the Court's
conclusion.  The citizenship analysis is not limited to Wells
Fargo's control over the specific property at issue in this case.
Rather, to determine whether Wells Fargo is an active trustee,
*Navarro* instructs that the Court look at the Trustee's powers as
to the entire trust.

[17]   The implausibility of CCC Atlantic's argument becomes
apparent when one considers its practical implications.  If CCC
Atlantic's position were correct, the numerous Certificateholders
would have to bring suit to foreclose on the property at issue.
But the Certificateholders are merely investors in mortgage-

**(2)**

CCC Atlantic further argues that even if this Court looks to Wells Fargo's citizenship in its jurisdictional analysis, Wells Fargo still has not adequately demonstrated complete diversity because it has failed to account for Capmark Bank's citizenship.[19]

This argument is somewhat confusing.  By asserting that Capmark, as holder of the B Note, is a "real party in interest," CCC Atlantic seems to be arguing that Capmark must be joined as a "required party" pursuant to Fed. R. Civ. P. 19(a)(1)(B).[20]

---

backed securities.  It strains credulity to believe that any investor believed or intended, at the time they were purchasing their certificates, that they may have to prosecute foreclosure proceedings to protect the value of their investment.

[18]   At oral argument CCC Atlantic relied on *JPMCC 2005-CIBC13 Collins Lodging, LLC, v. Phillips South Beach, LLC,* 2010 WL 4317000 (S.D. Fla. Oct. 22, 2010) in support of its Motion. After considering the parties' supplemental briefs analyzing the case, the Court concludes that *Collins Lodging's* holding is entirely consistent with this Court's holding.  *Collins Lodging* concerned the citizenship of an artificial entity, not a trustee. *Collins Lodging* explicitly noted that "Wells Fargo, as trustee for the registered holders of the [mortgage pass-through certificates] is not attempting to sue in its own right." 2012 WL at *4.  For that reason, the Court held that *Navarro* did not apply.  *Id.* at *3-4.  In this case, however, Wells Fargo is suing in its own right as trustee and thus, *Navarro* does apply.

[19]   CCC Atlantic apparently assumes that Capmark is a "citizen" of Utah and Pennsylvania because it is a "Utah industrial bank" (Compl. Ex. A), with "a presence in Horsham, Pennsylvania."  (Moving brief, p. 7)  CCC Atlantic cites no authority for this assumption, and the Court does not accept it as true.  However, in light of the Motion's disposition, the Court need not determine Capmark's citizenship.

[20]   *See generally* 6A Wright, Miller, Kane & Marcus, Federal Practice and Procedure, § 1543 ("the question of who should . . . be joined in the action must be determined under Rule 19 . . .

16

This argument fails for at least two reasons.

First, Rule 19 expressly provides that a required party must be joined <u>if</u> "joinder will not deprive the court of subject-matter jurisdiction." Fed. R. Civ. P. 19. Thus, even assuming *arguendo* that Capmark is a required party, and that its joinder would, as CCC Atlantic itself asserts, destroy diversity[21], this case could proceed without Capmark.

Second, Capmark apparently contracted-away most, if not all, of its interest in this suit. Wells Fargo submits the "Co-Lender Agreement" between the Note A Lender and Note B Lender which states that the Note B Lender "shall have no voting, consent, or other rights whatsoever with respect to the Note A Lender's administration of or exercise of its rights and remedies with respect to the Mortgage Loan," and further, that, "the Note B Lender agrees that it shall have no right to . . . exercise any remedies with respect to the Mortgage Loan or the Borrower." (Opposition Brief, Ex. 3, Co-Lender Agreement, § 5(a), p. 17)

Moreover, any remaining right to receive payment on the B Note appears to be protected by the Co-Lender Agreement (see §§ 3, 4) such that proceeding without Capmark would not "as a practical

---

rather than Rule 17(a). The fact that an absent person could bring the action as a real party in interest does not of itself make that person a necessary or indispensable party.").

[21] As noted previously, Capmark's citizenship is an open issue. Moreover, Capmark's argument assumes that Capmark would be joined as a plaintiff, which may not be the appropriate alignment of parties.

matter impair or impede [its] ability to protect [its] interest."
Fed. R. Civ. P. 19(a)(1)(B)(I).

Accordingly, CCC Atlantic's argument fails.


In summary, the Court holds: (1) Wells Fargo is an active
trustee, therefore its state of citizenship must be used in the
diversity analysis; and (2) Rule 19 does not require Capmark's
joinder as a party to this suit.  Accordingly, the Court concludes
that complete diversity of citizenship exists between the parties;
therefore the Court may exercise subject matter jurisdiction
pursuant to 28 U.S.C. § 1332.


**B.**

Wells Fargo seeks an order appointing a receiver who will
collect all rents and income, as well as operate and manage the
property.

When considering whether to appoint a receiver in the context
of a mortgage foreclosure, the following factors guide the Court in
its exercise of discretion: "the property is inadequate security
for the loan; the mortgage contract contains a clause granting the
mortgagee the right to a receiver; the continued default of the
mortgagor; the probability that foreclosure will be delayed in the
future; the unstable financial status of the mortgagor; [and] the
misuse of project funds by the mortgagor." *United States v. Berk &*

*Berk*, 767 F. Supp. 593, 597 (D.N.J. 1991)[22]; *see generally Canada Life Assurance Co. v. Alfred R. Lapeter*, 563 F.3d 837, 845 (9th Cir. 2009) ("the district court has broad discretion in appointing a receiver, . . . it may consider a host of relevant factors, . . . no one factor is dispositive.").

When the moving party seeks a receiver who will not only collect rents and profits, but will also manage and operate the mortgaged property pending foreclosure, federal courts are particularly cautious in appointing a receiver, and therefore consider whether the evidence demonstrates "'something more'" than just "'the doubtful financial standing'" of the defendant and the "'inadequacy of the security.'" *Canada Life Assurance Co.*, 563 F.3d at 845 (internal citation omitted); *The Chase Manhattan Bank, N.A. v. Turabo Shopping Center, Inc.*, 683 F.2d 25, 26 (1st Cir. 1982) (internal citation omitted).

The additional factors warranting appointment of a receiver to manage the property may include: "the danger of waste[;] delays in foreclosure," *Canada Life Assurance Co.*, 563 F.3d at 845 (internal citation and quotation omitted); the defendant's "fraudulent

---

[22] *Berk & Berk* was a foreclosure action involving a residential apartment project where the loan was coinsured by the United States Department of Housing and Urban Development.  767 F. Supp. at 593-96.  While additional factors may be considered in such cases (for example, whether the federal policy objectives underlying the National Housing Act would be furthered by appointing a receiver, *Berk & Berk*, 767 F. Supp. at 597), the above-quoted factors equally inform the equitable analysis in the commercial foreclosure context. *See Canada Life Assurance Co.*, 563 F.3d at 844.

conduct"; "imminent danger that property [will] be lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property." *Turabo Shopping Center, Inc.*, 683 F.2d at 26-27 (internal citation and quotation omitted); *accord Consolidated Rail Corp. v. Fore River Railway Co.*, 861 F.2d 322, 326 (1st Cir. 1988).[23]

In considering the relevant factors, the Court concludes that Wells Fargo is entitled to the relief it seeks.

First, Article 11.02(d) of the Loan Agreement specifically provides that after an "Event of Default"[24], Wells Fargo may apply for the appointment of a receiver to manage and operate the property, and that CCC Atlantic "consents, to the extent permitted by applicable law, to the appointment of a receiver."  (Compl. Ex. A).

Additionally, the Assignment of Lease and Rents, executed

---

[23]  These factors are not exclusive, however.  As the Ninth Circuit has emphasized, the Court may consider "any circumstance which commends itself to a court of equity as a reason" for appointing a receiver to manage the property. *Canada Life Assurance Co.*, 563 F.3d at 845 (internal citation and quotation omitted).

[24]  CCC Atlantic apparently does not dispute that the failure to cure the tax escrow shortfall is an Event of Default.

along with the Loan Agreement (Compl. Ex. E, Assignment of Leases
and Rents), gives Wells Fargo the right to all rents upon an Event
of Default.  In the Assignment of Leases and Rents, CCC Atlantic
"irrevocably, absolutely and unconditionally" assigned to Capmark
(Wells Fargo's predecessor in interest) "all of [its] right, title
and interest in and to" all leases and rents from the property,
which right the lender then "licensed" back to CCC Atlantic so long
as no Event of Default occurred.  (Id., Assignment of Leases and
Rents, §§ 1.02, 1.04)  But that license was expressly "revocable."
(Id. § 1.02)  The Assignment provides that upon an Event of
Default, the license "terminate[s] automatically, and Lender shall
be entitled to receive and collect the Rents as they become due and
payable and exercise all of [CCC Atlantic's] rights . . . under the
Leases with respect to the Rents."  (Id. § 1.04)

     The importance of these contractual provisions cannot be
underestimated because they set apart this commercial foreclosure
case from the traditional scenario in which a receiver is sought at
equity and no such contractual provisions exist.  Thus, this case
is qualitatively different from cases relied upon by CCC Atlantic
which are stockholder suits seeking appointment of a receiver to
manage a corporation.  *See, e.g., Roach v. Margulies,* 42 N.J.
Super. 243 (App. Div. 1956).

     This Court agrees that traditionally at equity appointment of
a receiver to manage a corporation is a "drastic action [which
should be] avoided where possible . . . if the necessary relief can

be accomplished by some less onerous expedient." *Roach*, 42 N.J. Super. at 245 (quoted at p. 13 of CCC Atlantic's opposition brief). But that general statement of the law simply does not apply to a case like this where the parties have agreed *ex ante* that, in the event of a default, the lender has the right to all rent payments and to the appointment of a receiver.[25]  Under such circumstances, appointment of a receiver is not such a drastic remedy.

Second, CCC Atlantic's admitted inability to cure the tax escrow default due to cash flow problems (Karman Aff. Ex. A), and its continued failure to cure the default, demonstrates its doubtful financial standing.

Third, the Court finds that the value of the mortgaged property is less than the amounts due and owing under the Note and Mortgage.  Wells Fargo submits the affidavit of the relevant loan servicing officer, Michael Nikula, who swears to this very fact. (Nikula Aff. ¶ 6)  On the other hand, CCC Atlantic submits the affidavit of Robin Karman, the managing member of the Cornerstone Commerce Center's general partner, which states, "I have been orally advised" in connection with the potential arm's length sale

---

[25]  New Jersey law recognizes the enforceability of absolute assignments of rents. *See First Fidelity Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.),* 59 F.3d 423, 427 (3d Cir. 1995) ("It is settled in New Jersey that an assignment of rents passes title to the assignee.  An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires right to such performance.") (internal citations omitted).

of the property to a third party, that the property has $7 million
in equity.  (Karman Aff. ¶ 21)  This statement is merely hearsay.
Moreover, Karman stated in his Affidavit (signed April, 2012) that
a final written appraisal of the property would be provided to his
counsel (Id.), yet that written appraisal has never been submitted
to the Court.  Accordingly, the Court credits Mr. Nikula's
testimony over the unsupported testimony of Mr. Karman, and
therefore concludes that the property is inadequate security for
the loan.[26]

Fourth, by CCC Atlantic's own admission, it has been
improperly diverting income generated by the property by using that
income to pay management fees ahead of the amounts due under the
Loan Documents.  In support of CCC Atlantic's assertion that no
income is "used for any other purpose than the operation of the
Property," Mr. Karman's affidavit states that CCC Atlantic pays
"approximately $10,000 a month" in property management fees and "an
asset management fee of $50,000 annually."[27] (Karman Aff. ¶ 20)
Yet in the Assignment of Property Management Contract and

_____

[26]  *Cf. Canada Life Assurance Co.*, 563 F.3d at 845 (holding
not clearly erroneous the district court's factual finding about
the insufficiency of the collateral, observing that "[t]he
district court was entitled to credit the analysis [of] a
commercial mortgage manager over [the defendant's] unsupported
testimony that he 'believed'" that the property had approximately
$5 million in equity).

[27]  The property manager appears to be Karman Development
Group, LLC. (Wells Fargo's Reply Ex. 3) Wells Fargo asserts "upon
information and belief" that "the management company is a related
entity to Defendant."  (Reply Brief p. 6)

23

Subordination of Management Fees Agreement (Wells Fargo Reply Ex. 3), CCC Atlantic agreed that "[a]ll Management Fees hereby are subordinated to the Loan and lien of the Security Instrument." (Ex. 3, Article 1.02)  Thus, the evidence establishes the "danger of substantial waste and risk of loss" from the improper diversion of income.  *Canada Life Assurance Co.*, 563 F.3d at 845 (observing that "income from the [mortgaged property] was being diverted and not applied to servicing the debt encumbering [the property] and the real estate taxes on it.").

Lastly, the Court is not persuaded by CCC Atlantic's argument that the equities favor denying the appointment of a receiver because Wells Fargo has been accepting interest payments from CCC Atlantic but has not been applying those payments to the accrued interest.  Section 2.04(f) of the Loan Agreement provides that "[f]ollowing and during the continuance of an Event of Default, Lender may apply all payments to amounts then due in any manner and in any order determined by Lender, in its sole discretion." (Compl. Ex. A)  Therefore, Wells Fargo has not acted inequitably.

Thus, the Court concludes that equity favors appointing a receiver to collect rents and income from, as well as operate and manage, the Cornerstone Commerce Center.  Wells Fargo's Motion to Appoint a Receiver will be granted.

## IV.

In light of the foregoing, Defendant's jurisdictional motion

24

will be denied and Plaintiff's Motion to Appoint a Receiver will be granted.  An appropriate Order accompanies this Opinion.


November 20, 2012                    __s/ Joseph E. Irenas_____
                                     Joseph E. Irenas, S.U.S.D.J.