UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C5,<br><br>      Plaintiff,<br><br>   v.<br><br>CCC ATLANTIC, LLC,<br><br>      Defendant. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 12-521<br>(JEI/JS)<br><br>**OPINION** |

**APPEARANCES:**

DINSMORE & SHOHL LLP
By: Richard A. O'Halloran, Esq.
    Alyson H. Ricker, Esq.
502 Carnegie Center
Suite 103
Princeton, New Jersey 08540
    Counsel for Wells Fargo Bank, N.A. as Trustee

SILVERANG & DONOHOE, LLC
By: Mark S. Haltzman, Esq.
    Philip S. Rosenzweig, Esq.
595 East Lancaster Avenue
Suite 203
Saint Davids, Pennsylvania 19087
    Counsel for CCC Atlantic, LLC

**IRENAS**, Senior District Judge:

    This case is primarily a commercial foreclosure action. In November, 2012, this Court granted Plaintiff Wells Fargo's Motion to Appoint a Receiver to receive rents and manage the property at

issue (the Cornerstone Commerce Center in Linwood, New Jersey)[1]; and Wells Fargo's Motion for Summary Judgment on its foreclosure claim is presently pending. The instant Motion, however, concerns Defendant CCC Atlantic's counterclaims against Wells Fargo. For the reasons stated herein, Wells Fargo's Motion to Dismiss the counterclaims will be granted. However, Wells Fargo's application for fees and costs associated with this Motion will be denied.

**I.**

Wells Fargo holds the mortgage loan and note secured by CCC Atlantic's property, the Cornerstone Commerce Center. The parties' dispute began when, in 2011, property tax abatements expired, resulting in an increased tax bill for the property at issue.

According to CCC Atlantic, before 2011, Linwood sent property tax bills directly to CCC Atlantic, which paid the bills without Wells Fargo's involvement. (Amended Counterclaim ("A.C.") ¶ 13) However, upon the expiration of the tax abatement in 2011, Linwood changed its practice and began billing Wells Fargo. (Id. ¶ 15) Thus, in August, 2011, Wells Fargo received a property tax bill which sought to collect the unabated property taxes on the property

---

[1] The order actually appointing the receiver was not entered until February, 2013. The delay between the order granting the motion to appoint a receiver and the order actually appointing the receiver resulted from CCC Atlantic's attempt to appeal the receivership decision and then CCC Atlantic's bankruptcy filing. CCC Atlantic's Chapter 11 petition was dismissed without prejudice on February 8, 2013, and this Court entered the order appointing a receiver on February 15, 2013.

for the first half of 2011 (the first and second quarters). (Id. ¶¶ 15-16) Wells Fargo used the funds it then held in CCC Atlantic's tax escrow account to pay the bill. (Id. ¶ 16) However, due to the "massive" increase in the bill (resulting from the expiration of the tax abatement)[2], the account balance did not cover the entire amount due. (Id.) Wells Fargo, therefore, paid the difference-- "approximately $267,000"-- "and charged the payment to CCC Atlantic's tax escrow account" causing a deficiency. (Id.)

CCC Atlantic asserts that it had no way of knowing that Linwood would change its billing practices, nor that Wells Fargo would pay the entire bill without first notifying CCC Atlantic that it planned to do so. According to CCC Atlantic, it was caught by surprise when, in early August, 2011, Wells Fargo's loan servicer "gave notice to CCC Atlantic of the tax bill from Linwood and Wells Fargo's payment thereof, together with a demand for payment of the entire sum (i.e., $267,000) within ten (10) days." (A.C. ¶ 21)

CCC Atlantic responded to the notice with "a financial proposal" which, if accepted, would "fully cure the . . . tax escrow shortfall" "over the course of the ensuing two (2) years."

---

[2] The tax assessed in 2011 reflected a 20% increase over the previous year. *Wells Fargo v. CCC Atlantic, LLC,* 905 F. Supp.2d 604, 609 (D.N.J. 2012). One might take issue with CCC Atlantic's characterization of this increase as "massive." However, such characterization is immaterial insofar as under *Twombly* and *Iqbal* this Court is not required to accept as true characterizations of the facts.

3

(A.C. ¶ 22) CCC Atlantic alleges that Wells Fargo completely stonewalled it, "refus[ing] to meet" with it, and "ignor[ing] CCC Atlantic's good faith attempts to solve the . . . deficiency." (Id. ¶ 24)

The same scenario played out again with respect to the tax bill for the third and fourth quarter of 2011. Linwood, "unbeknownst to CCC Atlantic," sent the bill to Wells Fargo, Wells Fargo paid it, and charged the payment of $289,000 to CCC Atlantic's tax escrow account, which still did not have sufficient funds to cover the bill. (A.C. ¶ 23).

Throughout this time, and despite CCC Atlantic's "voluntary" payments of "$30,000 into the tax escrow account in both September and October 2011," Wells Fargo "stark[ly] refus[ed]" to work with CCC Atlantic to "rectify" the situation. (A.C. ¶¶ 22, 29)

On November 28, 2011, after two consecutive deficiencies in CCC Atlantic's tax escrow account, "Wells Fargo declared the Loan in default." (A.C. ¶ 24) "Wells Fargo served CCC Atlantic with a demand notice seeking repayment of the entirety of the principal sum, together with default interest and late fees." (Id. ¶ 25) CCC Atlantic "and/or its principals" responded by offering to cure the escrow shortfall, "without payment in full of excessive fees, default interest, and the like," but Wells Fargo's special servicer refused. (Id. ¶ 26)

CCC Atlantic seems to allege that it continued to make loan payments (of an unspecified amount) for a period of time after

4

Wells Fargo declared the Loan in default (A.C. ¶ 27), but then "Wells Fargo, through its special servicer, advised CCC Atlantic to cease making payments, as Wells Fargo was simply going to foreclose on the Property." (Id. ¶ 29)

The Amended Counterclaim Complaint asserts five counts: (1) breach of contract (i.e., breach of the loan agreement); (2) "breach of duty of good faith and fair dealing"; (3) "tortious breach of duty of good faith and fair dealing"; (4) "tortious interference with existing contractual relations"; and (5) "tortious interference with prospective contractual relations."

Pursuant to Fed. R. Civ. P. 12(b)(6), Wells Fargo moves to dismiss the entire Amended Counterclaim Complaint for failure to state a claim.

**II.**

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In order to survive a motion to dismiss, a complaint must allege facts that raise a right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 8(a)(2). While a court must accept as true all factual allegations in the plaintiff's complaint, and view them in the light most favorable to the plaintiff, *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008), a court is not required to accept sweeping legal

conclusions cast in the form of factual allegations, unwarranted inferences, or unsupported conclusions. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). The complaint must state sufficient facts to show that the legal allegations are not simply possible, but plausible. *Phillips*, 515 F.3d at 234. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.

The Court addresses each count in turn.

### A.

CCC Atlantic alleges that Wells Fargo breached Section 4.02(d) of the Loan Agreement when it failed "to provide notice of CCC [Atlantic's] increased tax obligations and escrow deficiency." (A.C. ¶ 43) However, the plain language of Loan Agreement does not support CCC Atlantic's position.

Section 4.02 of the Loan Agreement is entitled "Tax Escrow." (Wells Fargo Ex. A) It provides:

> (a) <u>Deposits to the Tax Escrow Account.</u> On the Closing Date, Borrower has deposited such amount as noted in the closing statement relating to the closing of the Loan, to the Tax Escrow Account which is the amount determined by Lender that is necessary to pay

6

when due . . . . Thereafter, beginning on the first Payment Due Date and on each Payment Due Date thereafter, Borrower shall deliver to Lender the Monthly Tax Deposit.

(b) <u>Disbursement from Tax Escrow Account.</u> Provided amounts in the Tax Escrow Account are sufficient to pay the Taxes then due and no Event of Default exists, Lender shall pay the Taxes as they become due on their respective due dates on behalf of Borrower by applying the funds held in the Tax Escrow Account to the payments of Taxes then due. In making any payment of Taxes, Lender may do so according to any bill, statement or estimate obtained from the appropriate public office with respect to Taxes without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.

(c) <u>Surplus or Deficiency in Tax Escrow Account.</u> If amounts on deposit in the Tax Escrow Account collected for a quarterly tax period exceed the Taxes actually paid during such tax period, Lender shall, in its discretion, return the excess to Borrower or credit the excess against the payments borrower is to make to the Tax Escrow Account for the next quarterly tax period. If amounts on deposit in the Tax Escrow Account collected for a quarterly tax period are insufficient to pay the Taxes actually due during such tax period, Lender shall notify Borrower of the deficiency and, within ten (10) Business Days thereafter, Borrower shall deliver to Lender such deficiency amount. If, however, Borrower receives notice of any such deficiency on a date that is within ten (10) Business Days prior to the date that Taxes are due, Borrower will deposit the deficiency amount within two (2) Business Day [sic] after its receipt of such deficiency notice.

(d) <u>Changes in Amount of Taxes Due; Changes in the Monthly Tax Deposit.</u> Borrower shall notify Lender immediately of any changes to the amounts, schedules and instructions for

7

>                    payment of any Taxes of which it has or
>                    obtains knowledge and authorizes Lender or its
>                    agent to obtain the bills for Taxes directly
>                    from the appropriate taxing authority.  If the
>                    amount due for Taxes shall increase and Lender
>                    reasonably determines that amounts on deposit
>                    in the Tax Escrow Account will not be
>                    sufficient to pay Taxes due for a quarterly
>                    tax period, Lender shall notify Borrower of
>                    such determination and of the increase needed
>                    to the Monthly Tax Deposit.  Commencing with
>                    the Payment Due Date in such notice from
>                    Lender, Borrower shall make deposits at the
>                    increased amount of the Monthly Tax Deposit.

(Id.)

First, the Loan Agreement provides that CCC Atlantic ("the Borrower") shall notify Wells Fargo ("the Lender") "of any changes to the amounts . . . of any Taxes," (Section 4.02(d)), not the other way around, as CCC Atlantic contends.  The Loan Agreement does not require Wells Fargo to notify CCC Atlantic of CCC Atlantic's own tax obligations.

Second, as to notice of the escrow deficiency, even according to CCC Atlantic's own allegations, Wells Fargo complied with the terms of the Loan Agreement.  Section 4.02(c) provides, "[i]f amounts on deposit in the Tax Escrow Account collected for a quarterly tax period are insufficient to pay the Taxes actually due during such tax period, Lender shall notify Borrower of the deficiency and, within ten (10) Business Days thereafter, Borrower shall deliver to Lender such deficiency amount."  Wells Fargo fulfilled its obligation when in early August, 2011, Wells Fargo's

8

loan servicer "gave notice to CCC Atlantic of the tax bill from Linwood and Wells Fargo's payment thereof, together with a demand for payment of the entire sum (i.e., $267,000) within ten (10) days." (A.C. ¶ 21)

CCC Atlantic contends that the Loan Agreement required Wells Fargo to notify it of the deficiency prior to paying the tax bill, not after paying it. However, nothing in Section 4.02(c) requires Wells Fargo to give notice before paying a tax bill.

Moreover, Section 4.02(d) might require prior notice, but under circumstances not alleged here. If CCC Atlantic had advised Wells Fargo of the upcoming expiration of property tax abatements-- i.e., if CCC Atlantic had complied with the provision stating that "Borrower shall notify Lender immediately of any changes to the amounts . . . of any Taxes"-- then perhaps Wells Fargo would have been required to notify CCC Atlantic of the deficiency and to allow CCC Atlantic to deposit sufficient funds into the Tax Escrow Account prior to payment of the 2011 tax bill. But CCC Atlantic never gave notice to Wells Fargo. Therefore, Wells Fargo's notice obligations in such a situation, whatever they may be, were never triggered.

The facts alleged fail to state a claim for breach of the Loan Agreement. Wells Fargo's Motion to Dismiss will be granted as to Count 1 of the Amended Counterclaim Complaint.

**B.**

CCC Atlantic's good faith and fair dealing claims[3] also fail. The New Jersey Supreme Court's decision in *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates*, guides this Court's analysis. 182 N.J. 210 (2005). The opinion begins,

> [i]n the highly competitive world of commercial transactions, sophisticated business entities operate according to the impersonal laws of the marketplace in which self-interest, not altruism, is the dominating principle. We must decide to what extent the covenant of good faith and fair dealing, which is implicit in every contract, governs the arms-length business transactions of such entities.

*Id.* at 214. The Court goes on to describe the covenant of good faith and fair dealing which is implied in every contract:

> [g]ood faith conduct is conduct that does not violate community standards of decency, fairness or reasonableness. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing anything which will have the effect of destroying or injuring

---

[3] As stated *supra*, Count 2 asserts a claim for breach of duty of good faith and fair dealing, and Count 3 asserts a claim for tortious breach of duty of good faith and fair dealing. The parties, however, treat these Counts as one claim so this Court will as well.
    Alternatively, breach of the duty of good faith and fair dealing plainly requires proof that a defendant acted in "bad faith" "with ill motives and without any legitimate purpose," *Brunswick Hills Racquet Club v. Route 18 Shopping Center Assoc.*, 182 N.J. 210, 226 (2005). CCC Atlantic's claim for tortious breach of the duty of good faith and fair dealing is legally deficient because it rests on the allegation that "Wells Fargo negligently [or] grossly negligently . . . failed to exercise its duties owed to [it]." (A.C. ¶ 57)

10

> the right of the other party to receive the benefits
> of the contract. Proof of bad motive or intention
> is vital to an action for breach of the covenant. .
> . . As a general rule, subterfuges and evasions in
> the performance of a contract violate the covenant
> of good faith and fair dealing even though the actor
> believes his conduct to be justified.

*Id.* at 224-25 (internal citations and quotations omitted).

In *Brunswick Hills* the New Jersey Supreme Court concluded that the evidence at trial demonstrated that a commercial landlord acted in bad faith in dealing with its commercial tenant. In that case, the tenant timely attempted to exercise an option for a long-term (99 year) lease 19 months before the contractual deadline for exercising the option. 182 N.J. at 215-17. Over the course of the 19 months prior to the deadline, the tenant repeatedly wrote to its landlord expressing its intent to exercise the option, and asking for a response. *Id.* at 217-20. However, due to a mistake, the tenant never "perfect[ed] the option," as required by the contract, by paying the landlord an up-front payment of $150,000.00 on or before the option deadline. *Id.* at 215-16.

Aware that the tenant had not paid to purchase the option, and further, "not want[ing] the purchase price because the successful exercise of the option was not in [the landlord's] economic interest," the landlord deliberately "engaged in a [19-month] pattern of evasion," so that it could take advantage of the tenant's mistake, declare the option expired after the deadline,

11

and rent the property to another tenant on more favorable terms. *Brunswick Hills,* 182 N.J. at 229-30.

The Court held that this evidence demonstrated the landlord's bad faith, explaining, "[the tenant's] repeated letters and telephone calls to [its landlord] concerning the exercise of the option and the closing of the ninety-nine-year lease obliged [the landlord] to respond, and respond truthfully." *Brunswick Hills*, 182 N.J. at 230. The Court further explained, "[t]he breach of the covenant of good faith and fair dealing in this case was not a landlord's failure to cure a tenant's lapse. Instead, the breach was a demonstrable course of conduct, a series of evasions and delays, that lulled [the tenant] into believing it had exercised the lease option properly." *Id.* at 230-31.

This case is distinguishable from *Brunswick Hills*. CCC Atlantic alleges no facts plausibly supporting an inference that Wells Fargo acted in bad faith. CCC Atlantic's amended counterclaims assert that Wells Fargo acted in bad faith when it "refused to negotiate with CCC and/or consider its proposals to cure the tax escrow deficiencies." (A.C. ¶¶ 51, 56) But even according to CCC Atlantic's own allegations, it proposed to cure the deficit "over the course of the ensuing two (2) years," (A.C. ¶ 22), not within ten days as undisputedly required by the Loan Agreement. A party does not breach its duty of good faith and fair dealing by refusing to re-write the terms of the contract upon another party's default, even if that default was the result

12

of a mistake.  Wells Fargo's alleged refusal to deal in these circumstances is not anything like the landlord's pattern of evasion in *Brunswick Hills.*

Moreover, nothing in the facts alleged plausibly supports a conclusion that Wells Fargo had anything to gain by remaining silent in response to CCC Atlantic's proposal.  Unlike the landlord in *Brunswick Hills*, Wells Fargo's alleged refusal to negotiate was not an attempt to trap CCC Atlantic into a default.  By the time Wells Fargo is alleged to have refused to negotiate, CCC Atlantic had already defaulted.  Therein lies the critical difference between this case and *Brunswick Hills*.  The landlord in *Brunswick Hills* saw the tenant's lapse coming from a mile away (19 months before the option deadline) and remained silent with the hope that its tenant would continue in its "misapprehension" that it was not obliged to pay the option price up front.  182 N.J. at 230.

Nothing in the facts alleged by CCC Atlantic supports a similar conclusion as to Wells Fargo.  CCC Atlantic does not allege that Wells Fargo anticipated that it would be directly billed for the property taxes or that when it was directly billed, CCC Atlantic's tax escrow account would not have sufficient funds to pay the bill.[4]

---

[4] CCC Atlantic claims in its brief that Wells Fargo "surreptitiously" paid the tax bill.  (Opposition Brief, p. 11) There was nothing surreptitious about it.  The loan documents created a Tax Escrow Account for the purpose of paying property

13

"The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract." *Brunswick Hills,* 182 N.J. at 224-25. CCC Atlantic alleges that its right to receive the benefits of the Loan Agreement has been injured, but that injury is not plausibly traceable to Wells Fargo. Rather, the injury is traceable to CCC Atlantic's own default and inability to cure the default within the contractually agreed-upon amount of time.

Accordingly, Wells Fargo's Motion to Dismiss will be granted as to Counts 2 and 3 of the Amended Counterclaim Complaint.

### C.

CCC Atlantic claims that Wells Fargo intentionally interfered with its existing and prospective contracts with lessees and investors in the Cornerstone Commerce Center. These claims also fail as a matter of law.

To survive the instant Motion, CCC Atlantic's tortious interference claims must rest on facts plausibly supporting a conclusion that Wells Fargo's actions with respect to CCC Atlantic were "improper" or "wrongful." *Nostrame v. Santiago*, 213 N.J.

---

taxes. Moreover, as already explained *supra* at Section III., A., Wells Fargo had no obligation under the Loan Agreement to notify CCC Atlantic before it paid the property tax bill.

109, 122-23 (2013). These claims fail because as already explained, the Amended Counterclaim Complaint fails to state claims for breach of contract or breach of the duty of good faith. Apart from the conduct alleged in support of those claims, no other wrongful conduct is alleged. The Court's holding that the alleged facts do not plausibly establish a breach of contract, nor bad faith, is tantamount to a holding that the alleged facts do not plausibly support a conclusion that Wells Fargo acted improperly or wrongfully.

Accordingly, Wells Fargo's Motion to Dismiss Counterclaims 4 and 5 will be granted.

**D.**

Lastly, Wells Fargo asks this Court to award it fees and costs associated with this Motion. The Court declines to do so.

Wells Fargo makes two arguments. First, relying on *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), and 28 U.S.C. § 1927, Wells Fargo argues that CCC Atlantic's assertion of "so wholly meritless" counterclaims against it "reflects an intent to improperly and unnecessarily compound these proceedings," (Moving Brief p. 34), and therefore awarding fees and costs is appropriate.

The Court declines to favorably exercise its discretion to award fees and costs under these circumstances. The Court is not persuaded that CCC Atlantic's actions in this case-- namely,

asserting counterclaims that were held to be meritless upon a motion to dismiss-- warrants departure from the general "American Rule" that parties bear their own fees and costs.

Second, Wells Fargo argues that fees and costs are authorized by the Loan Agreement. However, the Loan Agreement cannot be interpreted so broadly. It provides that "Borrower shall pay, on written demand by Lender, all reasonable costs incurred by Lender in . . . enforcing its rights under the Loan Documents, in each case whether or not legal proceedings are commenced . . . . Such fees and expenses include, without limitation, reasonable fees for attorneys . . . court fees, [and] costs in connection with pre-trial, trial and appellate level proceedings." (Loan Agreement, § 11.04) The plain language of Section 11.04 indicates that CCC Atlantic only agreed to pay Wells Fargo's reasonable costs "in enforcing [Wells Fargo's] rights under the Loan Documents," not in defending against CCC Atlantic's counterclaims.

Wells Fargo's request for fees and costs will be denied.

**IV.**

In light of the foregoing, Wells Fargo's Motion to Dismiss CCC Atlantic's Counterclaims will be granted, and its request for fees and costs will be denied. An appropriate Order accompanies this Opinion.

October 17, 2013                           s/ Joseph E. Irenas
                                                         Joseph E. Irenas, S.U.S.D.J.